United States v. Suarez. Mr. Lopez Mr. Chief Judge, may it please the court. With the court's permission, I'd like to focus initially on the issues regarding Mr. Suarez's sentence. Specifically, what we would argue is the erroneous application of a punished the kind of harm that had already been fully accounted for by the base offense level 42 under 216.1. Let me let me tell you Mr. Lopez a threshold question I had on that. You didn't object to that or the defense didn't object to that at trial. That's correct. We have a number of cases that say in order to be plain error where there's no objection in order to be plain error there has to be a Court of Appeals of our Court of Appeals or of the United States Supreme Court precedent on point to make it plain and we don't have that in this case. There's there's no decision of our court or of the Supreme Court saying that that applying these two specific factors is impermissible double counting is there or have I overlooked something? Your Honor, respectfully I would disagree and I think actually the law in this court is that you could have a 11th Circuit or Supreme Court case directly on point but if you had explicit language in the rule that would resolve the issue that would also suffice for plain error. That's true but we don't have a specific rule that says you can't apply these two at the same time to the same facts. Your Honor, I would argue that under this this court's precedent that if you looked at the plain language of the two provisions and it would be plain on that or be explicit the explicit language of that will resolve the issue that these two should not apply together that it would in fact be double counting of the law of this circuit that that would suffice for plain error under the law of this circuit, Your Honor. And the defense counsel below did not object and so would be reviewed for it for plain error where you would have to show error that was plain and that in fact affected substantial rights although the Supreme Court has stated that a misapplication of the sentencing guidelines would in fact suffice to meet that third prong. So it really comes down to those first two prongs and I do believe that under the precedent of this this court if you look at the express language of those two provisions that they actually do punish the exact same kind of harm and they go to conceptually the exact notions of sentencing and that they in due fact can constitute double counting if you look at those two provisions. One of your issues is that the sentence was substantively unreasonable. Mr. Suarez received a life sentence. I wonder if you can tell us you know there are several factors that the court takes into consideration in determining whether or not he received a reasonable sentence. Are there any factors in particular that you can point to that you think are strong that the district court failed to give due consideration to? Yes, Your Honor. And I think part of the the problem here was that as we would see it that that the fact that this 12 level enhancement did bump this up to something nonsensical which would be a 54 level. There is no 54 level. And I think that the district court in looking at the 3553 factors kept coming back to their seriousness of the offense and I think looked at that to the judgment of the other factors. You know that works against you. Obviously he got a life sentence on attempting to use a weapon of mass destruction, right? That's when he got the life sentence on. And so what are the, are there any factors that you feel like the statute? Yes, Your Honor. When you're looking at the specific facts of the offense itself, this was not a case where we had the FBI intervening at the last second of somebody who was going to bomb. Like if at the last second they had stopped the Boston Marathon bombers. That's not the case here. Here you have a government sting operation. You have government agents following this defendant for nearly three months. You have government agents repeatedly calling this defendant, berating him on the phone. Don't ignore us. Are you serious about this? Are you really serious about this? Or are you going to back up? They really took a long time and really kind of had to drag him to the point where he's in this car taking what he thinks is an actual bomb. That's what I'm getting at is it was a serious offense and there's a need to obviously, you know, if he really had a bomb and it exploded, there would be catastrophic consequences. And there's a need to deter this type of conduct. What factors do you think the court did not focus on that it should have focused on in support of your argument that a life sentence is unreasonable? I mean, would it be the need to avoid unwarranted sentencing disparities? I mean, you don't have much time. What factors would you focus on? Well, that is one of the factors, Your Honor, and even the cases that are cited by the government. Is that the strongest factor? Pardon me? The need to avoid unwarranted sentencing disparities? Yes, sir. If you look at similar situated. Where do you have to support your argument that the court failed to consider that factor sufficiently? As far as the sentencing transcript and what happened in the case that we looked at, there were some cases that were cited by the defense in their sentencing memorandum and I don't think that the district court paid much credence to those. But in fact, and if you look at, it's actually under my Eighth Amendment argument, but you look at the statistics at terrorist offenses that have happened and that have been well documented, not only in the Southern District of Florida, but nationally. When you look at mean sentences, average crimes, and those aren't even cases where there was a government sting operation. There were actually people that are about to do something bad and got intercepted. Those sentences are far below the sentence that Mr. Suarez got here. And you also have some personal characteristics of the defendant, which were not fully taken into consideration by the court. Dealing with his immaturity, his borderline IQ levels, his gullibility, all of that. I think all of that are things that should have been taken into account by the district court in this calculation that do merit a lower sentence than a life sentence. I haven't read the sentencing transcript yet, Mr. Lopez. Could you tell me what sentence, if any, the defense requested? Was there a request for a specific sentence or not? There was some talk, Your Honor. I believe that there was a 40-year that they talked about, a variance down to a 40-year. I think there was a mischaracterization, maybe, of Mr. Anton's, not acquiescence to a 40-year, but the defense did ask for a 40-year sentence at some point as a specific sentence. But there were a lot of different factors, and I think, again, the court kept coming back to the seriousness of the offense, but to the detriment of the other factors, specifically the ones that are more toward Mr. Suarez's specific characteristics. And in this case, the fact that you did have this government sting operation really is different than most cases. In fact, the only case that I could find that was similar was a Sixth Circuit case in which, this is United States v. Wright, 747 F. 3rd, 399. There, the FBI conducted a sting operation. It was a free Cleveland, people that were involved. The same thing, inert bombs, they gave them to these defendants, the defendants out there, there were real bombs. They actually went out and gave it to the defendants. The defendants went and put those bombs at the base of a bridge. And so, everything was very similar. In fact, they took additional steps. They ended up with a base offense level 24. Sentencing Mr. and how it factored into his calculus. I don't believe I don't believe the district court actually talked about that at all, which I thought was a major factor in this case that really kind of set it apart from some of the other terrorist case like, um, you know, the shoe bomber and the person who tried to light up his underwear. These were actual terrorists who were on their way to commit, um, something heinous. It wasn't the government putting 30 to 40 people, um, surveilling this one defendant for three months, really trying to get him to do something. In fact, I didn't have 30 or 40 people trying to get him doing anything. They just had 30 or 40 people trying to make sure he or somebody that he had incited weren't going. We're not going to do anything. Well, the 30 or 40 people were surveilling and that's correct. I know. But do you get a downward variance or reduction within the guidelines, depending on, I guess, invariant varies inversely with the number of people who are surveilling. That doesn't know. It was more of the fact that it was a government sting operation and that the government, but 30 to 40 people weren't staying in. You just had two folks, three folks talking to him, not 30 to 40. Now, the 30 to 40 were surveilling him, but you had the government making strong efforts to get him to commit this act, and I think that should have been taken care of and taken into consideration to a greater level by the district court. I see that my time is up. I'll just reserve my time for a rebuttal unless the court has any additional questions. Okay. Thank you, Mr Lopez. Mr Smith. Thank you, Your Honor. I may please the court. Jeffrey Smith for the United States with me. A council table is assisting United States Attorney Mark Anton who prosecuted this case. The defendant's convictions and sentence should be affirmed. I'd like to start with the same issues that Mr Lopez raised. Mr Lopez began by discussing the sentencing calculation, and we explained, I think, in detail in our brief how that was conducted and why that is correct. Chief Judge Carnes correctly states that under the The defense has the obligation to come up with binding authority that is precisely on point, and the defense points only to the sentencing guidelines themselves, but the sentencing guidelines themselves explicitly say, as we explained in our brief, that Chapter 2 enhancements and Chapter 3 adjustments shall be applied cumulatively even if they result from the same conduct, and this particular... No matter what? That seems like a little bit of an overstatement from the guidelines. You mean you can never have double counting between Chapters 2 and 3? Well, what the... Actually, I think what it says is unless the guidelines say otherwise. So, I think that the only way you'd have to have is... So, the default rule is that you apply both the adjustments and the enhancements even if they come from the same conduct. Well, I mean, the question is not whether they come from the same conduct. Putting aside the plain error issue, which I know is a big one, but if we're just talking about the double counting issue, it's not whether they arose from the same conduct, it's whether the enhancement is punishing the same thing so that you have what everyone calls double counting, right? Yes, I think that you are correctly stating the rule. The same conduct is, quote, from the rule that I was quoting, and it's a reference that even if it's the same conduct, you do apply the separate enhancements and adjustments. Now, you are correct that in this case, the enhancement and the adjustments are going to two separate things. You know, the first enhancement goes to the attempt to injure the United States and or aid a foreign adversary, whereas the adjustment in this case goes to the act of terrorism. And these are two separate things. Not all acts of terrorism are necessarily done to aid a foreign adversary, and certainly not all acts that are done to aid a foreign adversary or injure the United States are acts of terrorism. So in that sense, they're two different things. And as we noted in our brief, this enhancement and adjustment have been applied in a number of cases in this circuit and elsewhere, and there's no... Are there any decisions that are published anywhere in the country on whether or not these two can be applied at the same time or not? Well, in our brief, we cited a case from the Southern District of New York, and I think it's an unpublished case, but it described this specific argument and refuted it. I don't know that the other cases have specifically raised this issue because I'm not sure that defendants have raised it, and of course it wasn't raised in this case until the appellate level. So I hope that the court is aware this is an abuse of discretion standard, and that standard allows a range of choice for the district court so long as that choice does not constitute a clear error of judgment. In the instant case, Judge Martinez correctly calculated the guidelines range and then went through the sentencing factors and ultimately concluded that a variance from the guidelines range, which is life, was not warranted. In doing so, Judge Martinez considered all of the relevant factors. As there was some discussion earlier, he found that this was a very serious crime. He found that the defendant thought that he had a bomb that was going to do a lot of damage, and that he, the defendant, went out and bought nails to make this a deadly anti-personnel device. Judge Martinez found, as I think is undisputed, that general deterrence weighs heavily in favor of a high sentence in this case. He did, in fact, review the cases cited by the defense and by the government in other cases, and at page 38 of the sentencing transcript, he talks about how I want to go back and look at the sentencing hearing again, but tell me did Judge Martinez factor into the equation the fact that there was, I mean, he was kind of prodded and coaxed along by the government. Did that, did he, did Judge Martinez say anything about that? Well, I think, so Judge Martinez was obviously present for the trial, and he mentioned a couple of times at this hearing that he understand that he knows the evidence, but did he say anything about it at the sentencing hearing? Well, I think, so what I was getting to is, I think he, it was his conclusion that Mr. Suarez was not, was in fact very much predisposed to commit this crime, and that it was not the result of the government prodding. And if I could continue on that, I think that the government's conduct in this case is entirely appropriate. I think the use of a sting is an appropriate law enforcement technique that can save lives and stop crime. In the particular case, this is not something where the government went out looking for people that maybe they could convince. This was, Mr. Suarez was online for at least a month looking to recruit people for ISIS, talking about making a timer bomb, talking about, you know, how can I get money from ISIS for weapons. He was, he was sending out large numbers of messages to other people. One of those people went to the police and said, you know, someone is trying to recruit me to ISIS. It would have been, I think, derelict for the FBI not to look into that. And the FBI can't at this point just go and ask him. The FBI, you know, it's appropriate to send a cooperating witness in to talk to this person to find out what he's, whether he's really interested in violence, whether he's really trying to do something for Islamic State, who else he might be associated with, what other dangerous people might be out there. If you, if you look at the communications between Mohammed, who is the cooperating witness, and the defendant, it is virtually in all cases the defendant who is pushing the ideas of, I want bombs, I want, you know, to make a recruiting video for, for the Islamic State. Mohammed is, is going along, allow, you know, to find out more, trying to get, also I should note, Mr. Suarez had three guns at this point, two Glocks and an AR-15. The government was trying to get him to give those, those up, but he wouldn't do that. He, they make the video that Mr. Suarez dictates initially to Mohammed, what he wants to say in this, in this ISIS video, and then he goes and he dresses up for it, and he, and he films it, and he talks about Islamic State, he talks about brothers should join me, he talks about Baghdadi. All of this is before any of the, the one conversation, I think, that Mr. Lopez has talked about. That only occurs after, so after all of this, Mr. Suarez is interested in meeting somebody who's more, a more sophisticated terrorist than Mohammed, who was, who was portraying like himself, someone who didn't, who was, I'm sorry, was portraying someone who was sort of just getting involved. And so they go and they meet another individual who, Mr., known as Sharif, who is an ISIS agent, and we, we... I understand the government's argument with respect to what the evidence in the case is. A lot of it took place after the government informant got involved in the case, and sort of, I mean, there's some coaxing and prodding that's taken place in this case, and I was just curious as to how that factored into the district court's calculation in determining what a life sentence. Yes, sir. The second most severe sentence you can get, and, you know, there's evidence that, you know, he was a young, gullible, immature, you know, individual, and so I guess I'm just trying to make sure that the sentencing judge factored all this into the equation. And I guess another question that I have is for this offense, the offense for which he received a life sentence. Can the government point me to another case where someone's been convicted of this exact same crime, a young person like this, and received a life sentence? Your Honor, there's a couple questions in there that I'd like to try to address all of them. First of all, the question of the sting, which is what I was talking about earlier, which I think is not at all a mitigating factor, is separate from the question of what you call, what I think you called the gullibility of the defendant or his personal characteristics. That was something that was a mitigating factor, but the court has to take into consideration the nature and circumstances of the offense, though, right? Well, I agree with that, and I think here the circumstance was that the defendant wanted to do this bombing, that when he was told that this is something that's gonna shoot nails and they're gonna rip through people like bullets, he, yeah, like worse than bullets, he smiled. He was clearly interested in that, and I think that was, that's the key for the, that's a key part of the nature of the crime. I do think the characteristics of the defendant were relevant. They were raised. That was probably the number one argument that was made to Judge Martinez. He was very, he was very well aware of those arguments. He put a lot of thought into it. The record reflects that he did, in fact, consider it to be mitigating factors, but he felt that there were other factors, specifically the dangerousness of the defendant, that overweighed, that outweighed that mitigating factor and made a variance from the guidelines range inappropriate. And, you know, specifically, you have an individual who, even after, you know, all the things we've talked about, has never expressed any remorse or taken any responsibility. He got on the stand and he told what Judge Martinez found to be complete untruths that were entirely implausible. He declined to allocute a sentence. He turned down a sentencing plea because he didn't want to take any responsibility, although that would have been a lesser sentence. And, you know, Judge Martinez believed that he really wanted to kill people and that there was no reason to believe that he had changed. So, as for other cases, now, the defense in their, in the, below the defense did raise at the end of their brief the issue of other, other cases and the issue in their brief on appeal. They may have talked a little bit in, during, in the Eighth Amendment about the disparity factor, but I think that this doesn't come anywhere close to the Eighth Amendment disparity factor. So, but, but there's a long way of saying, I don't know that I can, there are numerous other cases of individuals getting life sentences for attempted bombing plots. Those weren't government stings, though, were they? I don't know the facts of any specific case in order to tell you one that meets all of, like, whatever specific relevant factors you might find here. I don't think there's anything wrong with a government sting, but there are, I mean, the event could not have taken place in this case. Well, this event couldn't have happened this way, but Mr. Suarez was, he was attempting to make explosives. He was attempting to make them on his own, and then he was attempting to get somebody else to supply them. And so, you know, the government, I think, quite prudently got in there and said, oh yeah, we'll supply it. Don't be looking somewhere else. You don't need to keep working on it. I mean, he talked, when he talked to, to the, the undercover, he talked about how he had been trying to make explosives. He hadn't quite gotten it. There was testimony at trial that he was maybe one, one common ingredient short of being able to make his own explosive. So I think making an explosive was something that he wanted to do and that he was determined to do. This particular, it came out this particular way because the government funneled it this way to, to make sure that something really disastrous didn't happen. Do you recall what the, what his guideline offense level ultimately was? 50, 50-something? Is that correct? Well, I wouldn't put it that way, no, because under the guidelines, 43 is the highest guideline, and if it comes to 54, it goes to 43, and that's the, that's the guideline. Technically, you're correct, but if you did all the addition, right, where, where, where did the numbers tally up to? It was 54 minus down to 43 because that was the top. That is correct, Chief Judge. Took out his double-counting. If you, if you credited his double-counting argument, it would have been 42 instead of 43. That's correct. That's what I was getting at. Yes, sir. If you, if you eliminated that second enhancement, right, the one that is alleged to be double-counting, where would he have ended up in terms of an offense level? He would have ended up at 42 with a criminal history, I believe, of 1, and that would be, I believe, 360 to life, but... I thought the criminal history was automatically 6 in terrorism case. Am I wrong? Well, it's automatically 6 if you have the enhancement, which, and to be clear, we definitely believe that the enhancement was properly applied, but I believe Judge Jordan was asking if, if the enhancement were not. It was, in fact, so you subtract that out, and you get 360 to life instead of life, right? I believe that's right, yes. Okay. Well, let me ask you this. On the Eighth Amendment issue, you cite Harmelin v. Michigan for the proposition only the most egregious sentences are, are violative of the Eighth Amendment, but you don't argue, for reasons I can't understand, that if the crime in Harmelin didn't justify life without parole, or did justify life without parole for a first offender, then you can't say this one didn't under the Eighth Amendment. Harmelin itself rejected an Eighth Amendment challenge on a first-time offender who, for possession with intent to sell cocaine a pound and a half, got life without parole, and the Supreme Court said, that's fine. Selling drugs is a terrible problem, and therefore, the penalty of life imprisonment without parole for a first offender is not disproportionate. I would have thought you had, would have argued that terrorism is a terrible problem, and therefore, life without parole for a first offender on this kind of terrorism crime is not disproportionate under the Eighth Amendment. Am I missing something? Is there something about? No, sir. I think that's absolutely right. I think that the crime in this case is significantly more serious than the one in Harmelin, and I think we cited a number of cases, that's probably the best one, because it is a life sentences under Eighth Amendment challenges in cases where there was no fatality. Of course, here, there was an attempt at fatalities, and if I could just, well, if that's all the court has, I would arrest. Thank you. Mr. Lopez, you've still got your full five minutes. Thank you. Just very quickly, I'd like to talk about a question Judge Jordan had about other cases. There are no cases, aside from the unpublished Southern District of New York case, in which these two provisions have been applied the same. That might be why there's no controlling president saying that it would be double counting, and these are provisions that have been in effect since 1996, or right after the ADPA of 1996. You ask, you say in your brief, you put the argument a certain way in your brief, and it has appeal, and it's got me thinking. You say, how can someone be convicted of an offense that is in furtherance of, or to help a foreign terrorist organization, and not be involved in a terrorism offense? Yes. You look at it that way, the argument has some appeal, but what if you flip them? Can you be convicted of a terrorism offense, when you are not acting on behalf of a foreign terrorist organization? As in like a domestic terrorist case? Any terrorist case. You're just, you're just a lone wolf. You don't, you're not, you don't have allegiance to any other group. You don't purport to have it. You don't purport to help them or act. You just commit an act of terrorism on, on your own. In that sort of a case, would, could you apply both enhancements? Well, Your Honor, the way that the double-counting case law is, you look at the second enhancement, and you say, well, is this going to punish the same kind of harm that has already been fully accounted for? In this case, he was convicted of using, or attempting to use a weapon of mass destruction to aid a foreign terrorist organization. So that's the basis. Now, that's the initial, that's the initial guideline or the statute of conviction? That's the initial guideline that gives you a base 42, and now you look at the next one from Chapter 3, the 12 level, felony offense that was intended to promote a federal crime of terrorism, and that's what you look at. Is this second one, is that punishing the, the exact same kind of harm that has already been fully accounted for? Your, your, your argument then has to, well, I think it has to be that because the first, these are not merely a separate enhancement after a base offense level. You get the big base offense level because of what's already in that guideline. That's correct. And so you have to start with that one. That one has to be initial one, and then the question then becomes whether having applied that one, then you can apply the second one. And there are cases where the 12 level enhancement has been applied to cases under 2M6.1, just not the level 42. There are cases where you end up at, I don't know the kind of offenses, but none of them charged anything that would have given you a level 42, so then you had the proper and advanced enhancement. Gary, also cited by the government, again, base offense level is 35, then you add the 12 to the 42 to get 47, or 12 to 35 to get 37. My math is a little bit better than that. Hammond, defendant convicted of money laundering, transportation of contraband cigarettes, but there were some terrorist elements into that, and so the 12 level enhancement was proper. And so, to me, it's kind of telling that if these two provisions came into effect in 1996, or ADPA came into effect in 1996, so these were like a year or two later, even the government cites that in their brief. 20 years, no cases in which both of the provisions have been put together, I think that's evidence that these two provisions do not go together, that they in fact go to the exact same harm and punish the exact same harm, and it is double counting to put both of those together, aside from that Southern District of New York case that was unpublished. Just quickly on the sting operations, your honor, before the government got involved in this in May, I think it was May 9th, Mr. Suarez had not committed a federal offense. And yes, the government, based on some of his rhetoric, should have gone in and let's test this guy, let's see what this is all about. They got their answer. They went in, they started talking to him, he said, yeah, let's do this, let's do something on July 4th, isn't that a great date? Yeah. You mentioned bomb several times before the government ever got involved, that he wanted to make bombs. I believe he mentioned bombs, he mentioned a lot of things that he parodied, but I don't think he committed any federal offense. Well, that's not what I'm talking about. The bomb and bomb-making wasn't the government's idea. It's not that they came in and said, hey, you want to do something, why don't you make a bomb? You'd already publicly advertised for help on making a bomb. Yes, before the government got involved. Yeah, and he had hooked up with a specific individual, codename Wolf or something of the other, in which he was talking about making a bomb. Tell me how to make a bomb, didn't he? He had not committed a federal offense before the government. I'm not talking about federal offense. He's out there trying to commit a federal offense. It's his idea to make a bomb. He's trying to figure out how to make a bomb. Please tell me how to make a bomb. The government didn't come in and said, hey, why don't you make a bomb? They didn't plant that idea. This is not like they induced him to commit a federal crime. He's out looking for help on how to commit a federal crime, wanting to know how to do it, the mechanics of it. I don't... I'm out of time. If I could answer that briefly, Your Honor. Yes, and I believe that the government is correct. The government should have stepped in and to see what they had, but they had their answer. Okay, they step in and they say they got somebody who wants to make a bomb, who's diligently searching about, maybe in an amateurish way, but trying to find somebody to tell him how to make a bomb. He's going to find somebody eventually. They needed to see how serious he was and we see it. He's trying to make a bomb. Therefore, we need to be there and assemble a case against him and prosecute him and get him off the streets where he can't finally get the information and make a bomb. If I may just very briefly, Your Honor, I know I'm way out of time. He, Mr. Suarez, told the agents, yeah, let's do something on July 4th, and then he stopped taking their phone calls, and then he started just ignoring them altogether, not being involved in it at all, and the agents that were trailing him saw what he was doing on 4th of July. He was with his buddies on Duval Street getting drunk. They should have seen at that point he is not serious. Yes, they should have gone in to check. Because he's drunk on the 4th of July, he's not a serious threat? He's not going to go through any of this unless the government... Not on the 4th of July, but I thought he explained that his phone was out of operation. He gave a lot of Okay, counsel. I think we've... If there are no further questions, I thank the court for its time. All right, we'll take that case under submission.